**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| MEL GROSS,<br><br>                    Plaintiff,<br><br>vs.<br><br>RAYTHEON COMPANY, TRACEY A. ATKINSON, ROBERT E. BEAUCHAMP, ADRIANE M. BROWN, STEPHEN J. HADLEY, THOMAS A. KENNEDY, LETITIA A. LONG, GEORGE R. OLIVER, DINESH C. PALIWAL, ELLEN M. PAWLIKOWSKI, WILLIAM R. SPIVEY, MARTA R. STEWART, JAMES A. WINNEFELD, JR., ROBERT O. WORK, UNITED TECHNOLOGIES CORPORATION, LIGHT MERGER SUB CORP., CITIGROUP GLOBAL MARKETS INC., and RBC CAPITAL MARKETS, LLC,<br><br>                    Defendants. | Civil Action No:<br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Mel Gross ("Plaintiff"), by his undersigned attorneys, for his complaint against Defendants, allege upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This is an action brought by Plaintiff, a holder of Raytheon Company ("Raytheon" or the "Company") securities against the above-captioned Defendants, including Raytheon and the members of the Company's board of directors (referred to as the "Board" or the "Individual Defendants," and, together with Raytheon, the "Defendants") for violations of

Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, in connection with its merger with United Technologies Corporation ("UTC").

2.      On June 9, 2019, Raytheon, United Technologies Corporation ("UTC"), and Light Merger Sub Corp. ("Merger Sub") entered into an Agreement and Plan of Merger (the "Merger Agreement").

3.      Pursuant to the Merger Agreement, Merger Sub will merge with and into Raytheon, with Raytheon surviving the merger, the separate corporate existence of Merger Sub shall cease, and Raytheon shall continue as the surviving corporation in the Merger (sometimes referred to herein as the "Surviving Corporation") (the "Proposed Transaction").

4.      On July 17, 2019, in order to convince Raytheon's public common shareholders to vote in favor of the Proposed Transaction, UTC filed a materially incomplete and misleading Form S-4 Registration Statement (the "Proxy") with the SEC addressed to the shareholders of both companies, in violation of Sections 14(a) and 20(a) of the Exchange Act.

5.      As stated in a June 9, 2019 joint press release issued by Raytheon and UTC, upon completion of the Proposed Transaction, current Raytheon shareholders will own approximately 43% of the combined company and current UTC shareholders will own approximately 57% of the combined company (the "Merger Consideration").

6.      The Proxy contains materially incomplete and misleading information concerning: (i) the valuation analyses prepared by the Company's financial advisors, Citigroup Global Markets Inc. ("Citigroup") and RBC, in support of their fairness opinions, and (ii) the potential conflicts of interest faced by the Board during the sales process leading up to the

Proposed Transaction.

7.      Additionally, although the Proxy does not yet set the date for the special meeting of Raytheon's shareholders to vote on the Proposed Transaction (the "Stockholder Vote"), the Proxy does state the merger parties' intention to conclude this merger during the first half of 2020.  It is therefore imperative that the material information that has been omitted from the Proxy is disclosed prior to the Stockholder Vote so Raytheon shareholders can properly exercise their corporate suffrage rights.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

9.      Personal jurisdiction exists over each Defendant either because each Defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because, among other things: (i) the conduct at issue will have an effect in this District; (ii) a substantial portion of the transactions and wrongs complained of herein occurred in this District; and (iii) certain Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

11.     ***Plaintiff Mel Gross*** is, and at all relevant times, has been a Raytheon stockholder.

**Defendants**

12.     ***Defendant Raytheon Company*** ("Raytheon" or the "Company") is a Delaware corporation with its principal executive offices located at 870 Winter Street, Waltham, MA 02451.  Raytheon is an international aerospace and defense company.  Raytheon common stock is traded under the ticker symbol "RTN".

13.     ***Defendant Tracy A. Atkinson*** ("Atkinson") is, and has been at all relevant times, a director of the Company.

14.     ***Defendant Robert E. Beauchamp*** ("Beauchamp") is, and has been at all relevant times, a director of the Company.

15.     ***Defendant Adriane M. Brown*** ("Brown") is, and has been at all relevant times, a director of the Company.

16.     ***Defendant Stephen J. Hadley*** ("Hadley") is, and has been at all relevant times, a director of the Company.

17.     ***Defendant Thomas A. Kennedy*** ("Kennedy") is, and has been at all relevant times, a director of the Company, and currently serves as the Company's Chairman and Chief Executive Officer ("CEO").

18.     ***Defendant Letitia A. Long*** ("Long") is, and has been at all relevant times, a director of the Company.

19.     ***Defendant George R. Oliver*** ("Oliver") is, and has been at all relevant times, a director of the Company.

4

20.     **Defendant Dinesh C. Paliwal** ("Paliwal") is, and has been at all relevant times, a director of the Company.

21.     **Defendant Ellen M. Pawlikowski** ("Pawlikowski") is, and has been at all relevant times, a director of the Company.

22.     **Defendant William R. Spivey** ("Spivey") is, and has been at all relevant times, a director of the Company.

23.     **Defendant Marta R. Stewart** ("Stewart") is, and has been at all relevant times, a director of the Company.

24.     **Defendant James A. Winnefeld, Jr**. ("Winnefeld") is, and has been at all relevant times, a director of the Company.

25.     **Defendant Robert O. Work** ("Work") is, and has been at all relevant times, a director of the Company.

26.     The parties in paragraphs 13 through 25 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with the Company, the "Defendants".

27.     **Defendant United Technologies Corporation** ("UTC") is a Delaware corporation with its principal executive offices located at 10 Farm Springs Road, Farmington, CT 06032, and is a party to the Merger Agreement.

28.     **Defendant Light Merger Sub, Corp.** ("Merger Sub") is a Delaware corporation and a party to the Merger Agreement.

29.     **Defendant RBC Capital Markets LLC** ("RBC") provided certain financial advisory services, including a fairness opinion, to the Raytheon Board in connection with the Proposed Transaction.

30.     **Defendant Citigroup Global Markets Inc.** ("Citigroup") evaluated the fairness of

the Proposed Transaction, from a financial point of view, of the exchange ratio to the holders of

Raytheon common stock.

## SUBSTANTIVE ALLEGATIONS

### The Proposed Transaction

31.     On June 9, 2019, the Company and UTC issued a joint press release announcing

the Proposed Transaction. The press release stated, in relevant part:

**Raytheon and United Technologies Aerospace Businesses
to Combine in Merger of Equals**

- **Combination will create a premier systems provider with advanced technologies to address rapidly growing segments of aerospace and defense**
- **Expanded technology and R&D capabilities to deliver innovative and cost-effective solutions aligned with customer priorities**
- **Significant near- and long-term benefits expected from uniting complementary portfolios of platform-agnostic capabilities, resulting in more than $1 billion of gross annual cost synergies by year four, as well as new revenue opportunities from combined technology**
- **Return of capital to shareowners expected to be $18 to $20 billion in first 36 months following completion of the merger**
- **United Technologies' separation into three independent companies remains on track; merger is expected to be tax-free and close in the first half of 2020, following completion of UTC portfolio separation**

WALTHAM, Mass. and FARMINGTON, Conn., June 9, 2019 – Raytheon Company (NYSE: RTN) and United Technologies Corp. (NYSE: UTX) have entered into an agreement to combine in an all-stock merger of equals. The transaction will create a premier systems provider with advanced technologies to address rapidly growing segments within aerospace and defense. The merger of Raytheon, a leading defense company, and United Technologies, a leading aerospace company, comprised of Collins Aerospace and Pratt & Whitney, will offer a complementary portfolio of platform-agnostic aerospace and defense technologies. The combined company, which will be named Raytheon Technologies Corporation, will offer expanded technology and R&D capabilities to deliver innovative and cost-effective solutions aligned with customer priorities and the national defense strategies of the U.S. and its allies and friends. The combination excludes Otis and Carrier, which are expected to be separated from United Technologies in the first half of 2020 as previously announced.

The combined company will have approximately $74 billion in pro forma 2019 sales. With a strong balance sheet and robust cash generation, Raytheon

Technologies will enjoy enhanced resources and financial flexibility to support significant R&D and capital investment through business cycles.

Under the terms of the agreement, which was unanimously approved by the Boards of Directors of both companies, Raytheon shareowners will receive 2.3348 shares in the combined company for each Raytheon share. Upon completion of the merger, United Technologies shareowners will own approximately 57 percent and Raytheon shareowners will own approximately 43 percent of the combined company on a fully diluted basis. The merger is expected to close in the first half of 2020, following completion by United Technologies of the previously announced separation of its Otis and Carrier businesses. The timing of the separation of Otis and Carrier is not expected to be affected by the proposed merger and remains on track for completion in the first half of 2020. The merger is intended to qualify as a tax-free reorganization for U.S. federal income tax purposes.

"Today is an exciting and transformational day for our companies, and one that brings with it tremendous opportunity for our future success. Raytheon Technologies will continue a legacy of innovation with an expanded aerospace and defense portfolio supported by the world's most dedicated workforce," said Tom Kennedy, Raytheon Chairman and CEO. "With our enhanced capabilities, we will deliver value to our customers by anticipating and addressing their most complex challenges, while delivering significant value to shareowners."

"The combination of United Technologies and Raytheon will define the future of aerospace and defense," said Greg Hayes, United Technologies Chairman and CEO. "Our two companies have iconic brands that share a long history of innovation, customer focus and proven execution. By joining forces, we will have unsurpassed technology and expanded R&D capabilities that will allow us to invest through business cycles and address our customers' highest priorities. Merging our portfolios will also deliver cost and revenue synergies that will create long-term value for our customers and shareowners."

**Combination to Create Long-Term Value**

- Balanced and diversified aerospace and defense portfolio that is resilient across business cycles: The merger establishes a broad and complementary portfolio of platform-agnostic capabilities across the high-growth segments of aerospace and defense, reducing risk of concentration in any individual platform or program.
- Highly complementary technology and R&D platform: With a combined annual company and customer funded R&D spend of approximately $8 billion, seven technology Centers of Excellence, and over 60,000 engineers, the company will develop new, critical technologies faster and more efficiently than ever before. Areas of joint advancement include, but are not limited to: hypersonics and future missile systems; directed energy

weapons; intelligence, surveillance, and reconnaissance (ISR) in contested environments; cyber protection for connected aircraft; next generation connected airspace; and advanced analytics and artificial intelligence for commercial aviation.

- <u>Attractive financial profile with strong cash flow generation and balance sheet</u>: Robust free cash flow growth and a strong balance sheet will support continued investment and return of capital to shareowners. The combined company expects to return $18 to $20 billion of capital to shareowners in the first 36 months following completion of the merger. As a result of the combination, the company also expects to capture more than $1 billion in gross annual run-rate cost synergies by year four post-close, with approximately $500 million in annual savings returned to customers. In addition, the combination presents significant long-term revenue opportunities from technology synergies.

- <u>Complementary company culture</u>: The combined company will have a strong performance-based culture focused on integrity, collaboration, innovation, diversity and corporate social responsibility. Employees will have expanded opportunities for career development and advancement in high-growth areas, as well as ongoing engagement in local communities.

**Pro Forma Business Structure**

Raytheon plans to consolidate its four businesses into two businesses to be named Intelligence, Space & Airborne Systems and Integrated Defense & Missile Systems. The new businesses will join Collins Aerospace and Pratt & Whitney to form the four businesses of Raytheon Technologies.

**Pro Forma Capital Structure**

Net debt for the combined company at the time of closing is expected to be approximately $26 billion, with United Technologies expected to contribute approximately $24 billion. The combined company targets an 'A' category credit rating at the time of the closing.

**Leadership and Governance**

The combined company's Board of Directors will be comprised of 15 members, consisting of 8 directors from United Technologies and 7 from Raytheon, with the lead director from Raytheon. Tom Kennedy will be appointed Executive Chairman and Greg Hayes will be named CEO of Raytheon Technologies. Two years following the close of the transaction, Hayes will assume the role of Chairman and CEO.

Raytheon Technologies will be headquartered in the greater Boston metro area, and will retain a corporate presence in existing locations. The company will be led by a highly experienced, proven leadership team with a strong track record of

innovation, delivering on synergies, and meeting financial and customer commitments.

**Timing and Closing**

The transaction is subject to the satisfaction of customary closing conditions, including receipt of required regulatory approvals, the approval of Raytheon and United Technologies shareowners, as well as completion by United Technologies of the separation of its Otis and Carrier businesses. As previously mentioned, the transaction is expected to close in the first half of 2020.

**2019 Financial Outlook**

There is no change to either Raytheon's or United Technologies' financial outlook for 2019.

**Advisors**

Citigroup Global Markets Inc. is acting as financial advisor to Raytheon, and RBC Capital Markets LLC provided a fairness opinion. Shearman & Sterling LLP is serving as legal advisor to Raytheon. Morgan Stanley & Co. LLC, Evercore, and Goldman Sachs & Co. LLC are acting as financial advisors to United Technologies. Wachtell, Lipton, Rosen & Katz is serving as legal advisor to United Technologies.

\* \* \*

**Transaction Website**

Additional information on the merger and related materials can be found on a joint transaction website at www.futureofaerospacedefense.com.

**About Raytheon**

Raytheon Company is a technology and innovation leader specializing in defense, civil government and cybersecurity solutions. With a history of innovation, Raytheon provides state-of-the-art electronics, mission systems integration, C5I® products and services, sensing, effects and mission support for customers in more than 80 countries. Raytheon is headquartered in Waltham, Massachusetts. Follow us on Twitter.

**About United Technologies**

United Technologies Corp., based in Farmington, Connecticut, provides high technology products and services to the building and aerospace industries. By combining a passion for science with precision engineering, the company is creating smart, sustainable solutions the world needs. For more information about

the company, visit our website at www.utc.com or on Twitter @UTC.

* * *

**Additional Information**

In connection with the proposed merger, United Technologies will file a registration statement on Form S-4, which will include a document that serves as a prospectus of United Technologies and a joint proxy statement of United Technologies and Raytheon Company (the "joint proxy statement/prospectus"), and each party will file other documents regarding the proposed merger with the SEC. In addition, in connection with the separation transactions, subsidiaries of United Technologies will file registration statements on Form 10 or S-1. INVESTORS AND SECURITY HOLDERS ARE URGED TO READ THE JOINT PROXY STATEMENT/PROSPECTUS AND OTHER RELEVANT DOCUMENTS FILED WITH THE SEC WHEN THEY BECOME AVAILABLE, BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION. A definitive joint proxy statement/prospectus will be sent to United Technologies' shareowners and Raytheon Company's shareholders. Investors and security holders will be able to obtain the registration statements and the joint proxy statement/prospectus free of charge from the SEC's website or from United Technologies or Raytheon Company. The documents filed by United Technologies with the SEC may be obtained free of charge at United Technologies' website at www.utc.com or at the SEC's website at www.sec.gov. These documents may also be obtained free of charge from United Technologies by requesting them by mail at UTC Corporate Secretary, 10 Farm Springs Road, Farmington, CT, 06032, by telephone at 1-860-728-7870 or by email at corpsec@corphq.utc.com. The documents filed by Raytheon Company with the SEC may be obtained free of charge at Raytheon Company's website at www.raytheon.com or at the SEC's website at www.sec.gov. These documents may also be obtained free of charge from Raytheon Company by requesting them by mail at Raytheon Company, Investor Relations, 870 Winter Street, Waltham, MA, 02541, by telephone at 1-781-522-5123 or by email at invest@raytheon.com.

**Participants in the Solicitation**

United Technologies and Raytheon Company and their respective directors and executive officers and other members of management and employees may be deemed to be participants in the solicitation of proxies in respect of the proposed merger. Information about United Technologies' directors and executive officers is available in United Technologies' proxy statement dated March 18, 2019, for its 2019 Annual Meeting of Shareowners. Information about Raytheon Company's directors and executive officers is available in Raytheon Company's proxy statement dated April 16, 2019, for its 2019 Annual Meeting of Shareholders. Other information regarding the participants in the proxy solicitation and a description of their direct and indirect interests, by security

holdings or otherwise, will be contained in the joint proxy statement/prospectus and other relevant materials to be filed with the SEC regarding the transaction when they become available. Investors should read the joint proxy statement/prospectus carefully when it becomes available before making any voting or investment decisions. You may obtain free copies of these documents from United Technologies or Raytheon Company as indicated above.

32.     The Merger Consideration is unfair because, among other things, the intrinsic value of the Company is in excess of the amount the Company's shareholders will receive in connection with the Proposed Transaction.

33.     It is therefore imperative that the Company common shareholders receive the material information that Defendants have omitted from the Proxy so that they can meaningfully assess whether the Proposed Transaction is in their best interests prior to the vote.

**THE MERGER AGREEMENT**

34.     Section 5.2 of the Merger Agreement provides for a "no solicitation" clause that prevents Raytheon from soliciting alternative proposals and constrains its ability to negotiate with potential buyers:

Section 5.2      No Solicitation by Raytheon

(a)      Raytheon shall not, and shall cause its controlled affiliates and its and their officers, directors, employees, investment bankers, financial advisors, attorneys, accountants and other representatives (each, a "Representative") not to, directly or indirectly, (i) solicit, initiate or knowingly encourage (including by way of furnishing information), or take any other action to facilitate, any inquiries regarding, or the making of, any proposal the consummation of which would constitute a Raytheon Alternative Transaction, or (ii) participate in any discussions or negotiations, or cooperate in any way with any person (or group of persons), with respect to any inquiries regarding, or the making of, any proposal the consummation of which would constitute a Raytheon Alternative Transaction; provided that, if, at any time prior to obtaining the Raytheon Stockholder Approval, the Board of Directors of Raytheon determines in good faith (after consultation with its outside counsel and financial advisors) that any such proposal that did not result from a breach of this Section 5.2(a) constitutes or would reasonably be expected to result in a Raytheon Superior Proposal, subject to compliance with Section

5.2(c), Raytheon and its Representatives may (A) furnish information with respect to Raytheon and its subsidiaries to the person (or group of persons) making such proposal (and its Representatives) (provided that all such information has previously been provided to UTC or is provided to UTC prior to or substantially concurrent with the time it is provided to such person) pursuant to a customary confidentiality agreement containing confidentiality terms generally no less restrictive than the terms of the confidentiality agreement, effective as of December 11, 2018, between Raytheon and UTC (the "Confidentiality Agreement"), and (B) participate in discussions or negotiations regarding such proposal with the person (or group of persons) making such proposal and its Representatives. For purposes of this Agreement, "Raytheon Alternative Transaction" means any of (1) a transaction or series of transactions pursuant to which any person (or group of persons) other than UTC and its subsidiaries (such person (or group of persons), a "Raytheon Third Party"), or the direct or indirect stockholders of such Raytheon Third Party or the resulting company, acquires or would acquire, directly or indirectly, beneficial ownership (as defined in Rule 13d-3 under the Exchange Act) of, or would otherwise own or control, directly or indirectly, more than 20% of the outstanding shares of Raytheon Common Stock or securities (or options, rights or warrants to purchase, or securities convertible into or exchangeable for, such securities) representing more than 20% or more of the equity or voting power of Raytheon (or the resulting company), (2) a merger, consolidation, share exchange or similar transaction pursuant to which any Raytheon Third Party acquires or would acquire, directly or indirectly, assets or businesses of Raytheon or any of its subsidiaries representing more than 20% or more of the revenues, net income or assets (in each case on a consolidated basis) of Raytheon and its subsidiaries taken as a whole, (3) any transaction pursuant to which any Raytheon Third Party acquires or would acquire, directly or indirectly, control of assets (including for this purpose the outstanding equity securities of subsidiaries of Raytheon and any entity surviving any merger or combination including any of them) of Raytheon or any of its subsidiaries representing more than 20% or more of the revenues, net income or assets (in each case on a consolidated basis) of Raytheon and its subsidiaries taken as a whole, or (4) any disposition of assets to a Raytheon Third Party representing more than 20% or more of the revenues, net income or assets (in each case on a consolidated basis) of Raytheon and its subsidiaries, taken as a whole.  For purposes of this Agreement, a "Raytheon Superior Proposal" means any bona fide written proposal (on its most recently amended or modified terms, if amended or modified) made by a Raytheon Third Party to enter into a Raytheon Alternative Transaction (with all references to 20% in the definition of Raytheon Alternative Transaction being treated as references to 50% for these purposes) that (A) did not result from a breach of this Section 5.2(a), (B) is on terms that the Board of Directors of Raytheon determines in good faith

(after consultation with its outside financial advisors and outside legal counsel) to be superior from a financial point of view to Raytheon's stockholders than the transactions contemplated by this Agreement, taking into account all relevant factors (including any changes to this Agreement that may be proposed by UTC in response to such proposal to enter into a Raytheon Alternative Transaction and the identity of the person making such proposal to enter into a Raytheon Alternative Transaction) and (C) is reasonably likely to be completed in accordance with its terms, taking into account all financial, regulatory, legal and other aspects of such proposal, and is not subject to a diligence or financing condition.

(b)      Except as permitted by this Section 5.2(b) or Section 5.2(d), neither the Board of Directors of Raytheon nor any committee thereof shall (i) withdraw, qualify or modify, or propose publicly to withdraw, qualify or modify, or fail to make, in each case in a manner adverse to UTC, the approval or recommendation by such Board of Directors or such committee of the Merger or this Agreement, (ii) approve or recommend, or propose publicly to approve or recommend, any Raytheon Alternative Transaction, (iii) fail to include in the Joint Proxy Statement the recommendation of the Board of Directors of Raytheon in favor of this Agreement and the Merger, (iv) fail to send to its securityholders, within ten (10) business days after the commencement of a tender or exchange offer relating to shares of Raytheon Common Stock (or, if earlier, at least two (2) business days prior to the Raytheon Stockholders Meeting), a statement disclosing that Raytheon recommends rejection of such tender or exchange offer and reaffirming its recommendation of this Agreement and the Merger or (v) fail to publicly reaffirm its recommendation of this Agreement and the Merger within ten (10) business days of UTC's written request to do so (or, if earlier, at least two (2) business days prior to the Raytheon Stockholders' Meeting) following the public announcement of any Raytheon Alternative Transaction (or any material amendment, including any change to the price or form of consideration); provided, that UTC shall not be entitled to make such written request, and the Board of Directors of Raytheon shall not be required to make such reaffirmation, more than once with respect to any particular Raytheon Alternative Transaction (or any material amendment thereto, including any change to the price or form of consideration) (any action or failure to act in clauses (i) through (v) being referred to as a "Raytheon Recommendation Change"). Notwithstanding the foregoing, in the event that, prior to obtaining the Raytheon Stockholder Approval, the Board of Directors of Raytheon determines in good faith, after consultation with its outside financial advisors and outside legal counsel, that it has received a Raytheon Superior Proposal that was not solicited, initiated, knowingly encouraged or facilitated or otherwise procured in violation of this Agreement, the Board of Directors of Raytheon may effect a Raytheon Recommendation Change (other than under clause (ii) of this Section

5.2(b)) if (A) the Board of Directors of Raytheon determines in good faith, after consultation with its outside financial advisors and outside legal counsel, that the failure to take such action would be inconsistent with its fiduciary duties under Applicable Law, (B) Raytheon has notified UTC in writing that it intends to effect a Raytheon Recommendation Change pursuant to this Section 5.2(b) (other than under clause (ii) of this Section 5.2(b)), (C) Raytheon has provided UTC with a copy of the proposed definitive agreements and other proposed transaction documentation between Raytheon and the person making such Raytheon Superior Proposal, and the identity of the person making such Raytheon Superior Proposal, (D) for a period of four (4) business days following the notice delivered pursuant to clause (B) of this Section 5.2(b), Raytheon shall have discussed and negotiated in good faith and made Raytheon's Representatives available to discuss and negotiate in good faith (in each case to the extent UTC desires to negotiate) with UTC's Representatives any proposed modifications to the terms and conditions of this Agreement or the transactions contemplated by this Agreement so that the failure to take such action would no longer be inconsistent with the fiduciary duties under Applicable Law of the Board of Directors of Raytheon (it being understood and agreed that any amendment to any material term or condition of any Raytheon Superior Proposal shall require a new notice and a new negotiation period that shall expire on the later to occur of (I) two (2) business days following delivery of such new notice from Raytheon to UTC and (II) the expiration of the original four (4)-business day period described in clause (D) above), and (E) no earlier than the end of such negotiation period, the Board of Directors of Raytheon shall have determined in good faith, after consultation with its outside financial advisors and outside legal counsel, and after considering the terms of any proposed amendment or modification to this Agreement, that (x) the Raytheon Alternative Transaction that is the subject of the notice described in clause (B) above still constitutes a Raytheon Superior Proposal and (y) the failure to take such action would still be inconsistent with its fiduciary duties under Applicable Law. Neither the Board of Directors of Raytheon nor any committee thereof shall cause or permit Raytheon or any of its controlled affiliates to enter into any letter of intent, agreement in principle, acquisition agreement or other agreement related to any Raytheon Alternative Transaction or requiring, or reasonably likely to cause, Raytheon to terminate, delay or fail to consummate, or that would otherwise impede, interfere with or be inconsistent with, the consummation of the Merger (other than a confidentiality agreement referred to in Section 5.2(a)).

(c)     In addition to the obligations of Raytheon set forth in Section 5.2(a) and Section 5.2(b), Raytheon shall promptly, and in any event within twenty-four (24) hours of receipt thereof, advise UTC orally and in writing of any request for information or proposal relating to a Raytheon

Alternative Transaction, the material terms and conditions of such request or proposal (including any changes thereto) and the identity of the person making such request or proposal. Raytheon shall (i) keep UTC reasonably informed of the status and details (including amendments or proposed amendments) of any such request or proposal on a reasonably current basis and (ii) provide to UTC as soon as reasonably practicable after receipt or delivery thereof copies of all correspondence and other written materials exchanged between Raytheon or its subsidiaries or any of their Representatives, on the one hand, and any person making such request or proposal or any of its Representatives, on the other hand, in each case that describes or contains any such request or proposal.

(d)    Other than in connection with a Raytheon Superior Proposal (which shall be subject to Section 5.2(b) and shall not be subject to this Section 5.2(d)), prior to obtaining the Raytheon Stockholder Approval, the Board of Directors of Raytheon may, in response to a Raytheon Intervening Event, take any action prohibited by clauses (i) or (iii) of Section 5.2(b), only if (i) the Board of Directors of Raytheon determines in good faith, after consultation with its outside financial advisors and outside legal counsel, that the failure to take such action would be inconsistent with its fiduciary duties under Applicable Law, (ii) Raytheon has notified UTC in writing that it intends to effect such a Raytheon Recommendation Change (under clauses (i) or (iii) of Section 5.2(b)) pursuant to this Section 5.2(d) (which notice shall specify the facts and circumstances providing the basis of the Raytheon Intervening Event and for the determination by the Board of Directors of Raytheon to effect a Raytheon Recommendation Change under clauses (i) or (iii) of Section 5.2(b) in reasonable detail), (iii) for a period of four (4) business days following the notice delivered pursuant to clause (ii) of this Section 5.2(d), Raytheon shall have discussed and negotiated in good faith and made Raytheon's Representatives available to discuss and negotiate in good faith (in each case to the extent UTC desires to negotiate) with UTC's Representatives any proposed modifications to the terms and conditions of this Agreement or the transactions contemplated by this Agreement so that the failure to take such action would no longer be inconsistent with the fiduciary duties under Applicable Law of the Board of Directors of Raytheon (it being understood and agreed that any material change to the relevant facts and circumstances shall require a new notice and a new negotiation period that shall expire on the later to occur of (A) two (2) business days following delivery of such new notice from Raytheon to UTC and (B) the expiration of the original four (4)-business day period described above in this clause (iii)), and (iv) no earlier than the end of such negotiation period, the Board of Directors of Raytheon shall have determined in good faith, after consultation with its outside financial advisors and outside legal counsel, and after considering the terms of any proposed amendment or modification to this Agreement, that the failure to

take such action would still be inconsistent with its fiduciary duties under Applicable Law. The term "Raytheon Intervening Event" means a material event or circumstance that was not known or reasonably foreseeable to the Board of Directors of Raytheon on the date of this Agreement (or if known or reasonably foreseeable, the consequences of which were not known or reasonably foreseeable to the Board of Directors of Raytheon the date of this Agreement), which event or circumstance, or any consequence thereof, becomes known to the Board of Directors of Raytheon prior to the Raytheon Stockholder Approval; provided, that (1) in no event shall any inquiry, offer or proposal that constitutes or would reasonably be expected to lead to a Raytheon Alternative Transaction constitute a Raytheon Intervening Event, (2) in no event shall any change in and of itself in the market price or trading volume of the securities of UTC constitute a Raytheon Intervening Event (it being understood that the facts or occurrences giving rise or contributing to such change may constitute or be taken into account in determining whether there has been a Raytheon Intervening Event), and (3) in no event shall any event or circumstances to the extent relating to the Otis Business or the Carrier Business constitute a Raytheon Intervening Event.

(e)      Nothing contained in this Section 5.2 shall prohibit Raytheon from taking and disclosing to its stockholders a position contemplated by Rule 14d-9 or Rule 14e-2(a) promulgated under the Exchange Act, or from issuing a "stop, look and listen" statement or similar communication of the type contemplated by Rule 14d-9(f) under the Exchange Act pending disclosure of its position thereunder; provided that any such disclosure or statement that constitutes or contains a Raytheon Recommendation Change shall be subject to the provisions of Section 5.2(b).

35.     In addition, Section 8.2(b) of the Merger Agreement requires Raytheon to pay $1.785 *billion* as a "termination fee" to UTC in the event this agreement is terminated by Raytheon and improperly constrains Raytheon from obtaining a superior offer.

## THE MATERIALLY INCOMPLETE AND MISLEADING FORM S-4

36.     On July 17, 2019, Defendants filed an incomplete and misleading Form S-4 (the "Proxy") with the SEC and disseminated it to the Company's shareholders.  The Proxy solicits the Company's shareholders to vote in favor of the Proposed Transaction.

37.     Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any

16

material misrepresentations or omissions.

38.     On June 9, UTC and Raytheon signed the Merger Agreement whereby Raytheon shareholders will get 2.3348 shares of "NewCo" stock, representing about 43% of the combined entity.  Prior to the deal, the EV of Raytheon was approximately $52 billion.  The deal values it at approximately $61 billion.  In order to discern whether the exchange ratio is fair, one would have to estimate the value of UTC's aerospace business – UTC is spinning off its OTIS and Carrier businesses.   The complexity of combining the two companies, where UTC will effectively be its own new company just prior to the merger, makes the financial analysis section particularly important.

39.     Raytheon retained Citigroup as its financial advisor in connection with the merger. In connection with this engagement, Raytheon requested Citigroup to evaluate the fairness, from a financial point of view, of the exchange ratio to the holders of Raytheon common stock.

40.     Citigroup performed a Selected Public Company Analysis where both Raytheon and UTC are valued based on ranges of multiples of publicly traded companies, including P/E, EBITDA, FCF yields, and FAS/CAS[1] adjusted EBITDA multiples for 2019 and 2020.   It concludes the value of Raytheon is between $51.4 billion to $65.1 billion.

41.     Citigroup then adjusts the value of Raytheon to account for "expected cash dividends and share repurchases assumed to occur between April 1, 2019 and June 30, 2020, as directed by Raytheon's management."

42.     While there is some disclosure in the Proxy regarding dividends, payment of such is dependent upon certain targeted debt levels.  It is not clear what amounts Citigroup included in

---

[1] FAS CAS refers to pension costs and rebates on pension costs. These are set forth in the projections section of the S-4.

17

potential dividends and share repurchases in its analysis in the Proxy.  This needs to be disclosed to make the Proxy not materially misleading.

43.     Once Citigroup made its adjustments for expected cash dividends and share repurchases, its estimate of the value of Raytheon drops to a range between $49.7 billion and $63.5 billion.  Citigroup then calculates Implied Exchange Ratio Reference Ranges of 1.74 – 3.33 (with the deal's exchange ratio of 2.33 in the middle).  Again, it is not clear if Citigroup is including both the adjusted (for dividends and share repurchases) and unadjusted Raytheon value in computing the range of exchange ratios.  This needs to be disclosed to make the Proxy not materially misleading.

44.     Citigroup refers to Enterprise Value as FV and makes reference to certain "adjustments to FV" but does not explain what adjustments were made (see Proxy p.97 – p.98) Citigroup states that the FV Adjustments were "provided by Raytheon's management."  See p. 98.  These FV adjustments factor into the value derived for Raytheon by Citigroup in the Selected Public Company Analysis.  Upon information and belief, the Proxy fails to make any disclosure of these adjustments.  These adjustments must be disclosed to make the Proxy not materially misleading.

45.     Citigroup also performs a DCF analysis of Raytheon and UTC using management's projections, as set forth in the Proxy.  Citigroup concludes Raytheon is worth between $56.3 billion to $80.6 billion, which is calculated "after taking into account the FV Adjustments of Raytheon as of March 31, 2019, as provided by Raytheon's management." Again, these adjustment values are not provided in the Proxy.  These adjustments need to be disclosed to make the Proxy not materially misleading.

46.     Citigroup then further adjusts downward the range of value of Raytheon by

dividends and share repurchases to $54.6 billion to $78.9 billion. No specific amounts are provided for such adjustments. The adjustments must be disclosed to make the Proxy not materially misleading.

47.     In its analysis of UTC, Citigroup used the projections for components of UTC's aerospace business, as set forth in the Proxy, but states that it took into account "supplemental information and data provided by Raytheon's management," and "adjustments to the forecasts and other information and data relating to the UTC aerospace business provided to, discussed with, and approved by management of Raytheon." (p.100-101).

48.     Upon information and belief, none of the "supplemental information and data" and "adjustments" to UTC's projections, are explained nor provided quantitatively in the Proxy. The Proxy will remain materially misleading unless this information is disclosed.

49.     In addition, Citigroup calculates a purported fair value for UTC of $71.7 billion to $116.2 billion. Citigroup states that this valuation of UTC takes into account "FV Adjustments" of UTC. Upon information and belief, these FV Adjustments are not disclosed. The Proxy will remain materially misleading unless the FV Adjustments are disclosed.

50.     Citigroup also estimates exchange ratios using these values of 1.46 – 3.40. The Proxy does not make clear whether both of the Raytheon value ranges were included in the analysis, or only the lower range, which was adjusted for dividends and share repurchases. The Proxy will remain materially misleading unless this information is disclosed.

51.     Citigroup also provided historical stock price performance, stating the 52-week range for Raytheon was $144.27 - $214.76 per share, but, none of the above analyses for Raytheon were distilled to a "per share number," so the Proxy is materially misleading because it adds this per share information but sets forth nothing as against which this per share number can

be compared. The Proxy will remain materially misleading unless this presentation is corrected.

52.     Furthermore, Citigroup also set forth an "analyst price target" analysis. Citigroup's analysis claims to determine that the appropriate one-year discounted price target per share are between $161.50 and $244.75 per share.  The above FV ("Enterprise or Firm" Value) numbers cannot easily be converted to a per share number and thus renders the Proxy materially misleading.

53.     As a shareholder of Raytheon, Plaintiff requires that the aforesaid Citigroup opinions be reconciled relative to the unaffected trading price of $185.00 per share.   The Citigroup analysis does not provide that.information and thus the Proxy remains materially misleading.

54.     Raytheon also engaged RBC to provide certain financial advisory services to the Raytheon Board in connection with the merger.

55.     RBC performed a Selected Public Companies Analysis.  RBC used essentially the same small group of comparable companies that Citigroup used. RBC then compared the value of Raytheon based on 2019 and 2020 EBITDA estimates.  RBC then purports to calculate a fair value per share for Raytheon of a range between $207.48 and $269.66 per share.

56.     RBC then performs the same analysis for UTC.  RBC purports to calculate a fair value per share for UTC of a range between $61.71 - $110.02 per share.  RBC then computes the implied exchange ratio ranges:  1.89 – 4.34x, the average of which is 3.12, which is well above the deal exchange ratio of 2.3348.  Upon information and belief, no explanation is given why the average implied exchange ratio calculated by RBC substantially exceeds the deal exchange ratio. The Proxy will remain materially misleading until this information is disclosed.

57.     In sum, the omission of the above-referenced information renders the Proxy

materially incomplete and misleading, in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the upcoming stockholder vote, Plaintiff will be unable to make an informed decision regarding whether to vote his shares in favor of the Proposed Transaction, and he is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

### (AGAINST ALL DEFENDANTS FOR VIOLATIONS OF SECTION 14(A) OF THE EXCHANGE ACT AND RULE 14A-9 PROMULGATED THEREUNDER

58.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

59.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

60.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that communications with shareholders in a recommendation statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

61.     Defendants have issued the Proxy with the intention of soliciting the support of

21

shareholders for the Proposed Transaction.   Upon information and belief, each Defendant reviewed and authorized the dissemination of the Proxy, which fails to provide critical information detailed above.

62.     In so doing, Defendants made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading. Each Defendant, by virtue of their roles in the Proposed Transaction, was aware of the omitted material information but failed to disclose such information, in violation of Section 14(a).   Defendants therefore had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

63.     The Proxy is materially misleading and omits material facts that are necessary to render it not misleading. Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger.

64.     Defendants knew or should have known that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, Defendants were required to be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

65.     Defendants violated the securities laws in preparing and reviewing the Proxy. The preparation of a registration statement by corporate insiders containing materially false or misleading statements or omitting a material fact violates securities laws.   Defendants and the Individual Defendants chose to omit material information from the Proxy or failed to notice the

material omissions in the Proxy upon reviewing it, which the Individual Defendants were required to do in their roles as officers and directors of the Company.

66.     The misrepresentations and omissions in the Proxy are material to Plaintiff who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

67.     Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II
## (AGAINST THE INDIVIDUAL DEFENDANTS FOR VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT)

68.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

69.     The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of the Company, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

70.     Each of the Individual Defendants was provided with, or had unlimited access to, copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the

statements or cause the statements to be corrected.

71.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein and exercised the same. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

72.    In addition, as set forth in the Proxy sets forth at length and described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.   The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

73.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

74.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.   By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

75.    Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

(A)     declaring that the Proxy is materially false and/or misleading;

(B)     enjoining, preliminarily and permanently, the Proposed Transaction until the Proxy is cured;

(C)     in the event that the transaction is consummated before the entry of this Court's final judgment, rescinding it or awarding Plaintiff rescissory damages;

(D)     directing that Defendants account to Plaintiff for all damages caused by them and account for all profits and any special benefits obtained as a result of their breaches of their fiduciary duties.

(E)     awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

(F)     granting Plaintiff such further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: July 19, 2019

**O'KELLY ERNST & JOYCE, LLC**

_/s/ Ryan M. Ernst_____

Ryan M. Ernst (No. 4788)
901 N. Market Street, Suite 1000
Wilmington, DE 19801
Phone (302) 778-4000
Facsimile: (302) 295-2873
Email: rernst@oelegal.com

_Attorneys for Plaintiff_

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
440 Park Avenue South
New York, NY  10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com